# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**RANDALL SCOTT GREER,**

      **Plaintiff,**

      **vs.**                                            **Civ. No. 18-224  KK**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13) filed May 8, 2018, in support of Plaintiff Randall Scott Greer's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits.  On July 20, 2018, Plaintiff filed his Motion to Reverse and Remand for Rehearing With Supporting Memorandum ("Motion").  (Doc. 19.) The Commissioner filed a Response in opposition on September 6, 2018 (Doc. 21), and Plaintiff filed a Reply on September 28, 2018.  (Doc. 22.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that remand is necessary, and the Motion is therefore **GRANTED.**

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 13.)

# I. Background and Procedural Record

Claimant Randall Scott Greer ("Mr. Greer") alleges that he became disabled on May 30, 2003, at the age of forty because of MRSA and depression.[2] (Tr. 220, 224.[3]) Mr. Greer completed high school in 1981, and has worked as a page attendant and administrative assistant for the State of New Mexico. (Tr. 225.) Mr. Greer reported he initially stopped working "for other reasons," but that his conditions became severe enough to keep him from working since November 11, 2011. (Tr. 224.)

On April 11, 2014, Mr. Greer protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 18, 191-96.) Mr. Greer's application was initially denied on August 26, 2014. (Tr. 84-92, 93, 122-25.) It was denied again at reconsideration on March 4, 2015. (Tr. 104-16, 117, 129-30.) On March 30, 2015, Mr. Greer requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 132-33.) ALJ James Linehan conducted a hearing on January 11, 2017. (Tr. 40-73.) Mr. Greer appeared in person at the hearing with attorney representative Jonathan Woods.[4] (*Id.*) The ALJ took testimony from Mr. Greer (Tr. 43-66), and an impartial vocational expert ("VE"), Melissa Brassfield (Tr. 66-72). On February 10, 2017, ALJ Linehan issued an unfavorable decision. (Tr. 15-31.) On January 8, 2018, the Appeals Council issued its decision denying Mr. Greer's request for review and upholding the ALJ's final decision. (Tr. 1-6.) On March 8, 2018, Mr. Greer timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

---

[2] Mr. Greer initially filed Title II and Title XVI claims. (Tr. 189-90, 191-96.) However, Mr. Greer waived his Title II claim at the Administrative Hearing. (Tr. 42.) There is no retroactivity for Title XVI payments. Therefore, the earliest possible established onset date in a Title XVI claim is the application filing date or protective filing date. *See* POMS DI 25501.370.A.1. – *The Established Onset Date for Title XVI Claims.*

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 13) that was lodged with the Court on May 8, 2018.

[4] Mr. Greer is represented in this proceeding by Attorney William S. Rode. (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.      Standard of Review**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence

. . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. Analysis

The ALJ made his decision that Mr. Greer was not disabled at step five of the sequential evaluation. (Tr. 29-31.) Specifically, the ALJ determined that Mr. Greer had not engaged in substantial gainful activity since May 30, 2003, his alleged onset date.[6] (Tr. 20.) He found that Mr. Greer had severe impairments of arthralgia, anxiety, depression, and posttraumatic stress disorder (PTSD). (*Id.*) The ALJ also found that Mr. Greer had nonsevere impairments of a history of MRSA, alcohol abuse disorder, hypertension, sleep apnea, anemia, and hearing loss. (Tr. 21.) The ALJ determined, however, that Mr. Greer's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 21-23.) As a result, the ALJ proceeded to step four and found that Mr. Greer had the residual functional capacity to

> lift 20 pounds . . . occasionally . . . and carry 10 pounds frequently. The claimant can stand and walk alternatively for 2 hours each activity out of 8 hours per day with sitting occurring intermittently throughout the remaining 6 hours of the day. The claimant can reach, push and pull with upper extremities up to 8 hours per 8-hour day. The claimant can use hands for grasping, holding and turning objects up to 8 hours per 8-hour day. The claimant can climb, stoop, kneel, crouch, crawl

---

[6] *See* fn. 2, *supra.*

and balance up to 6 hours per 8-hour day. In addition, claimant is limited to work that is of SVP level 2 or less as defined in the DOT with a limited ability to apply common sense understanding to remember and carry out very short and simple written or oral instructions, and can make simple work-related decisions with occasional interaction with supervisors, co-workers and general public.

(Tr. 23.) The ALJ further concluded at step four that Mr. Greer had no past relevant work. (Tr. 29.) At step five, the ALJ determined that based on Mr. Greer's age, education, work experience, RFC, and the testimony of the VE, there were jobs that existed in significant numbers in the national economy that Mr. Greer could perform. (Tr. 29-30.)

In support of his Motion, Mr. Greer argues that (1) the ALJ failed to properly account for the medical opinion of treating physician Dr. Patricia Carbajal, M.D.; (2) that the ALJ failed to articulate appropriate reasons for rejecting the medical opinions of PA-C Matthew Fitch and CNP Cheryl Brubaker; and (3) that the ALJ failed to resolve a conflict between the DOT and the VE testimony regarding the reasoning level requirements of the jobs identified, and that after eliminating two of the three jobs identified that conflict with the RFC, the resulting number of jobs is so low that it requires a *Trimiar* analysis. (Doc. 19 at 11-25.)

For the reasons discussed below, the Court finds (1) the ALJ provided appropriate explanations that are supported by substantial evidence for the weight he accorded the medical source opinions; (2) the ALJ failed to resolve the conflict between the VE testimony and DOT regarding the reasoning level requirements of the jobs identified; and (3) that the ALJ's step five error is not harmless. As such, this case requires remand to determine whether significant jobs exist in the national economy that Mr. Greer can perform.

### A. The ALJ Provided Appropriate Explanations That Are Supported By Substantial Evidence For the Weight He Accorded to the Medical Sources Opinions

The Administrative Record contains forty-eight treatment notes from ABQ Health Partners from June 11, 2014, through November 7, 2016, related to Mr. Greer's medical care. (Tr. 463-575, 710-16, 885-1001.) On June 11, 2014, Mr. Greer presented with complaints of hypertension, left elbow pain, depression, anxiety and alcohol abuse.[7] (Tr. 505-10.) Over the course of the next two years, Mr. Greer sought and received treatment for, *inter alia*, chest pain, hyperlipidemia, hearing loss, vision changes, low back pain, MRSA follow-up, basal cell carcinoma, skin rashes, gout, sleep apnea, and diverticulosis. (Tr. 463-575, 710-16, 885-1001.) Mr. Greer received most of his medical care at ABQ Health Partners where he was cared for by numerous healthcare professionals, with PA-C Matthew Fitch being his most frequent provider.[8] In December 2016, three of these providers, Patricia Carabajal, M.D., PA-C Fitch, and CNP Cheryl Brubaker, completed medical source statements on Mr. Greer's behalf. (Tr. 876-77, 1043-44, 1048-50.)

#### 1. Patricia Carabajal, M.D.

Mr. Greer first saw Dr. Carabajal on June 8, 2015, to establish care. (Tr. 923.) Mr. Greer wanted to be tested for diabetes due to urinary frequency and had "paperwork that he [wanted] signed for a medical disability due to [] chronic MRSA." (Tr. 923-24.) Mr. Greer reported that he continued to take iron for anemia and continued to see his psychologist for alcohol abuse.[9] (Tr.

---

[7] PA-C Matthew Fitch referred Mr. Greer for an elbow brace, prescribed Meloxicam (NSAID) and Lisinopril (High Blood Pressure), and considered an antidepressant pending blood work review. (Tr. 506.) PA-C Fitch advised Mr. Greer to stop drinking. (*Id.*)

[8] The providers who treated him included Patricia Carabajal, M.D.; Damen Sacomen, M.D.; Angela Wo, M.D.; Peter S. Guido, M.D.; Cardiologist Christina Lopez, M.D.; Ophthalmologist Suchitra Katiyar, OD; Dermatologist Jeffrey Becker, M.D.; Podiatrist Gary Nelson, DPM; Audiologist Richard Cram, AUD; Preston Matthews, D.O.; Malerie Mock, P.A.; Katie Joshi – Inactive PA; Cheryl Brubaker, CNP; and Deborah Pacheco, NP.

[9] ABQ Health Partners provider Preston Matthews, D.O. referred Mr. Greer for treatment related to his reported depression, and Mr. Greer began treating with Babak Mirin, M.D., on June 1, 2015. (Tr. 873-74, 917.) Dr. Mirin

924.) On physical exam, Dr. Carabajal noted, *inter alia,* that Mr. Greer appeared healthy and in no acute distress, that he had a "normal gait, no swelling of the lower extremities, no limping, AROM within normal limits, PROM within normal limits, no tenderness of the upper extremities and no tenderness of the lower extremities," and that Mr. Greer's "affect seemed normal, mood seemed normal and no decrease in concentrating ability." (Tr. 925.) Dr. Carabajal noted she took a MRSA swab of a skin irritation under Mr. Greer's abdominal fold. (*Id.*) She assessed (1) MRSA carrier; (2) urinary frequency; (3) low back pain; (4) alcohol abuse; and (5) anemia. (Tr. 921.) She planned to follow up on the MRSA swab,[10] obtain a renal function panel,[11] refer Mr. Greer to physical therapy for low back pain,[12] and prescribe pantoprazole. (Tr. 921.) She instructed Mr. Greer to submit the disability paperwork to physical therapy and to his counselor for evaluation. (*Id.*)

Mr. Greer saw Dr. Carabajal next on July 20, 2015. (Tr. 930-34.) Mr. Greer presented with complaints of itching skin and disability paperwork he wanted filled out.[13] (Tr. 932.) Mr. Greer also complained of ongoing pain in his back and elbows. (*Id.*) On physical exam, Dr. Carabajal noted, *inter alia*, that Mr. Greer appeared healthy and in no acute distress, that he had a "normal gait, no swelling of the lower extremities, no limping, no tenderness of the lumbar spine, AROM within normal limits, PROM within normal limits, no tenderness of the upper

---

treated Mr. Greer for dysthymia disorder, post-traumatic stress disorder, and general anxiety disorder for approximately seventeen months. (Tr. 1041.) On December 21, 2016, Dr. Mirin prepared a "To Whom It May Concern" letter in which he stated that he prescribed Celexa, Neurontin and Valium for Mr. Greer's mental impairments and that they "have been helping him." (*Id.*)

[10] Culture results from the MRSA swab were negative. (Tr. 1028.)

[11] Mr. Greer's renal function panel indicated results in the normal reference range. (Tr. 1027.)

[12] Dr. Carabajal provided a referral to Mr. Greer to VibrantCare Rehabilitation for physical therapy evaluation and treatment. (Tr. 921.) The Administrative Record does not contain any physical therapy records.

[13] Mr. Greer explained that he went to a physical therapy visit but did not address the paperwork. (Tr. 932.) He also explained that he had not addressed the disability paperwork with his psychiatrist. (*Id.*)

extremities and no tenderness of the lower extremities"; and that he was alert and oriented to person, place time, date, and situation.  (Tr. 938.)  Dr. Carabajal assessed low back pain, elbow pain, rash, anxiety and depression, and MRSA carrier.  (Tr. 930.)  She planned to refer Mr. Greer to Peak Motion for physical therapy evaluation and treatment for his low back and elbow pain; she noted that Mr. Greer's anxiety and depression were stable; and she advised Mr. Greer that the disability paperwork should be evaluated by physical therapy.  (*Id.*)

On August 5, 2015, Mr. Greer presented to Dr. Carabajal requesting Meloxicam for arthritis.  (Tr. 937.)  He reported aches in his right hand, knees, and back.  (*Id.*)  He also requested a referral for complaints of reduced hearing.  (*Id*.)  Dr. Carabajal's physical exam was unchanged from her July 20, 2015, exam.  (Tr. 938.)  She assessed Mr. Greer with reduced hearing and arthralgia.  (Tr. 935.)  She planned to refer Mr. Greer to Dr. Karl Horn to evaluate his hearing loss, and she prescribed Meloxicam for arthralgia.  (*Id.*)

On January 16, 2016, Mr. Greer saw Dr. Carabajal requesting a refill of his inhaler for wheezing.  (Tr. 942.)  He also complained of left foot pain, which Dr. Carabajal assessed as stable.  (Tr. 943.)  On physical exam, Dr. Carabajal noted, *inter alia,* that Mr. Greer had a "normal gait, no swelling of the lower extremities, no limping and no tenderness of the lower extremities"; and that he was alert and oriented to person, place, time, date and situation.  (Tr. 944.)

On March 2, 2016, Mr. Greer reported to Dr. Carabajal that he had slipped on some liquid at home and fallen, and that his left clavicle continued to be painful.  (Tr. 951.)  Mr. Greer also reported that his abdominal pain  had improved, that his rectal bleeding had resolved, and that he recently celebrated one year of sobriety.  (*Id.*)   On physical exam, Dr. Carabajal noted that Mr. Greer had a normal gait, no swelling of the lower extremities, no limping, was alert, and oriented to person, place, time, date and situation.  (Tr. 952-53.)  Dr. Carabajal discussed safety

issues, reviewed a recent abdominal ultrasound and indicated that Mr. Greer's abdominal pain was improved and stable, and congratulated Mr. Greer on his one year of sobriety. (Tr. 949.)

On December 21, 2016, Patricia Carabajal, M.D., prepared medical source statements related to Mr. Greer's ability to perform work-related physical and mental activities. (Tr. 1048-50.) As to Mr. Greer's physical limitations, she assessed that Mr. Greer could only lift/carry up to ten (10) pounds occasionally due to back pain; that he could sit for 2 hours, stand for 2 hours, and walk for 2 or 3 hours in an eight-hour workday due to depression and lack of concentration; that he could frequently reach, handle, finger, and push/pull with both hands; that, if his feet were rested, he could occasionally operate foot controls; that he could occasionally climb stairs and ramps, balance, and kneel; and that he could never stoop or crouch. (Tr. 1048-49.) Dr. Carabajal explained that Mr. Greer's physical problems would last for twelve consecutive months because Mr. Greer had problems with concentration and fatigue. (Tr. 1049.) As to Mr. Greer's mental limitations, she noted that Mr. Greer suffered from a pain producing impairment, injury or sickness; that it was not severe; that he suffered sleep disturbance due to his pain or other causes; that he had fatigue as a result of his impairments; and that Mr. Greer had to rest or lie down at regular intervals because of his pain and/or fatigue. (Tr. 1050.) She assessed that he had *slight limitations* in his ability to (1) perform activities within a schedule; (2) work in coordination with/or proximity to others without being distracted by them; and (3) complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. (*Id.*) She assessed that Mr. Greer had *moderate limitations* in his ability to (1) maintain attention and concentration for extended periods (*i.e.,* 2-hour segments); (2) maintain regular attendance and be punctual within

customary tolerance; and (3) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently.  (*Id.*)

The ALJ accorded Dr. Carbajal's opinion little weight.  (Tr. 28.)  The ALJ explained that Dr. Carbajal's assessed limitations were without support from the other evidence of record, "as well as [Mr. Greer's] own prior statement as reported hereinabove."  (*Id.*)  The ALJ also explained that Dr. Carbajal's opinions were conclusory, and that Dr. Carabajal provided little to no explanation of the objective relevant evidence she relied on in forming her opinions, and did not reference any diagnostic testing in support of her conclusions.  (*Id.*)  Finally, the ALJ explained that although Dr. Carabajal's opinions were legitimate and deserved consideration, the context in which they were produced could not be ignored; *i.e.,* that Mr. Greer sought and paid for Dr. Carabajal's opinions through an attorney referral and in connection with an effort to generate evidence for his appeal.  (*Id.*)

Mr. Greer argues that the ALJ failed to properly account for the medical opinions of treating physician Patricia Carabajal, M.D.  (Doc. 19 at 11-17.)  In support, Mr. Greer asserts that (1) the ALJ failed to specify what evidence from the record was inconsistent with Dr. Carabajal's assessments; (2) the ALJ failed to demonstrate how Mr. Greer's statements concerning his daily activities rendered Dr. Carabajal's opinion unsupported; (3) the ALJ's reliance on the lack of objective evidence and diagnostic testing was an erroneous basis for discounting Dr. Carabajal's expert opinion; and (4) that rejecting an opinion obtained for evidentiary purposes is speculative. (Doc. 19 at 11-17.)  The Commissioner contends that (1) the ALJ provided specific regulatory reasons for the weight he accorded, including references to the relatively normal medical findings that he discussed elsewhere in his determination; (2) the ALJ properly considered Mr. Greer's activities of daily living in weighing Dr. Carabajal's opinion; (3) the ALJ properly considered the

absence of objective evidence and diagnostic testing in weighing Dr. Carabajal's opinion; and (4) the ALJ properly considered the context in which Dr. Carabajal's opinion was obtained and, even if it was error, the ALJ provided other legitimate reasons. (Doc. 21 at 13-17.)

"In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). To do so, the ALJ must consider whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* If the answer is "no," the inquiry ends. *Id.* If the opinion is well supported, the ALJ must then determine if it is consistent with other substantial evidence in the record. *Id.* If the opinion is deficient in either of these respects, the opinion is not entitled to controlling weight. *Id.* However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the relevant regulatory factors.[14] *Id.* An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

---

[14] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

As an initial matter, the ALJ's speculation that Mr. Greer sought and paid for Dr. Carabajal's assessments solely to obtain evidence in the current appeal is not a proper basis for discounting a medical source opinion. *See generally Langley,* 373 F.3d at 1121 (rejecting as speculative the ALJ's conclusion that a medical report was simply an act of courtesy to a patient); *see also* 20 C.F.R. § 416.927(c) (setting forth appropriate factors for evaluating opinion evidence for claims filed before March 27, 2017). That aside, the ALJ nonetheless provided appropriate explanations that are supported by substantial evidence for the weight he accorded Dr. Carabajal's opinions.

In his determination, in the many paragraphs preceding his weighing of the medical source opinions, the ALJ discussed and summarized with sufficient specificity the record evidence and medical record evidence that was inconsistent with Dr. Carabajal's opinions regarding Mr. Greer's ability to do work-related physical and mental activities. *Oldham*, 509 F.3d at 1258; *see also* 20 C.F.R. §§ 416.927(c)(3) and (4) (explaining that the more a medical source presents relevant evidence in support of and better explains her medical opinions, and the more consistent a medical opinion is with the record as a whole, the more weight it will be given). For example, the ALJ discussed Mr. Greer's reported activities of daily living that were inconsistent with his alleged limitations, such as living alone, driving, caring for his personal needs and grooming, doing household chores of sweeping and laundry, grocery shopping, preparing his own meals, taking his Labrador for walks, attending daily AA meetings, golfing,[15] fishing, watching television with comprehension, and using his smartphone for texting. (Tr. 22, 24, 27.) The record supports these

---

[15] In January 2017 Mr. Greer testified that he had not golfed in two years, but his medical records contain numerous references to frequent golfing during the two-year period preceding his testimony, including in late October, 2016. (Tr. 53, 503, 508, 545, 928, 978, 988-89.)

findings.[16]  (Tr. 44, 55-58, 230-34, 251-54, 361, 491, 503, 508, 545, 928, 978, 988.)  *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013) (finding that the inconsistency between assessed limitations and a claimant's activities of daily living was a legitimate basis for discounting a medical source opinion).  The ALJ also discussed the inconsistency between Mr. Greer's testimony that he could lift and carry twenty pounds and Dr. Carabajal's assessment that Mr. Greer could never lift anything over eleven pounds and could only occasionally lift/carry up to ten pounds due to back pain.  (Tr. 24.)  The record supports this finding of inconsistency.  (Tr. 49, 1048.)  The ALJ discussed that physical exams performed by ABQ Health Partners providers consistently demonstrated, *inter alia*, that Mr. Greer had 5 out of 5 strength in his upper and lower extremities, no extremity edema, normal range of motion, could ambulate without assistance, could get on and off an exam table without difficulty, had only mild degenerative changes in his left elbow, that his MRSA had resolved, and that his gout had resolved.  (Tr. 24-25.)  The record supports these findings.  (Tr. 46, 510, 514, 518, 523, 528, 532, 537, 541, 545, 550, 560, 564, 569, 575, 594, 659, 889, 895, 900, 904, 910, 925, 933, 938, 944, 952, 958, 964, 994, 1028, 1038.)  The ALJ discussed that mental status exams performed by Mr. Greer's treating psychiatrist, Babak Mirin, M.D., consistently demonstrated that Mr. Greer had normal eye contact, an appropriate affect, good judgment and insight, normal speech, a cooperative demeanor, and a clean appearance.[17]  (Tr. 25-26.)  The record supports these findings.  (Tr. 827, 835, 838, 841, 847, 851, 854, 857, 862, 865.)  The ALJ also discussed the examining State agency psychological consultant's report in which Susan Flynn, Ph.D., observed that Mr. Greer was fully oriented, had good eye contact, normal

---

[16] The record also supports that Mr. Greer reported and testified he cares for his yard and does a lot of gardening.  (Tr. 58, 254, 361.)  Mr. Greer initially reported he mows his yard, but then testified he does not mow his yard.  (Tr. 58, 232, 252.)

[17] *See* fn. 9, *supra*.

motor activity, steady attention, normal speech, organized thought processes with some circumstantial thinking, and did serial sevens quickly and accurately.[18]  (Tr. 26.)  The record supports this finding.[19]  (Tr. 360-61.)  Thus, the ALJ's discussion of the evidence prior to weighing the medical source evidence demonstrates that he properly considered whether Dr. Carabajal's opinions were supported by her treatment notes and the record as whole, as he was required to do, and cited to specific record evidence that was inconsistent with the Dr. Carabajal's opinions. *Langley,* 373 F.3d at 1119; *see* 20 C.F.R. §§ 416.927(c)(3) and (4).

Mr. Greer's reliance on *Robinson v. Barnhart*[20] for the proposition that the ALJ improperly discounted Dr. Carabajal's opinions as to his mental impairments for lack of objective evidence and diagnostic testing is misplaced.  In *Robinson*, the Tenth Circuit found, in relevant part, that the ALJ's analysis of a treating physician's opinion was deficient in several respects.  *Robinson,* 366 F.3d at 1982.  In particular, the court noted that it was unable to ascertain how or why the ALJ found the medical source opinion "vague and conclusive," and commented that if the ALJ meant it was inadequately supported, "that a psychological opinion may rest either on observed signs and symptoms or on psychological tests . . . *thus, [the treating physician's] observations about claimant's limitations do constitute specific mental findings.*"  *Id.* (emphasis added).  Here, Dr. Carabajal did not perform any psychological tests.[21]  Moreover, Dr. Carabajal's treatment

---

[18] The ALJ noted that Dr. Flynn assessed that Mr. Greer was capable of paying attention and following directions, could do tasks of daily living, and was capable of managing his own funds.  (Tr. 27.)  The ALJ accorded Dr. Flynn's opinion some weight and explained that Dr. Flynn's examination and opinions were prior to Mr. Greer's mental health treatment with Dr. Babak Mirin and that the new evidence in the record diminished her opinion somewhat.  (*Id.*)

[19] The record also demonstrates that although ABQ Health Partners providers assessed depression and anxiety from time to time, their treatment notes contain no evidence of psychological exams, mental status exams, or observations that Mr. Greer was functionally limited based on his mental impairments.

[20] 366 F.3d 1078 (10th Cir. 2004).

[21] The Administrative Record contains evidence of only one psychological test.  On July 28, 2014, nonexamining State agency psychological consultant Susan M. Flynn, Ph.D., performed a Mini Mental Status Exam.  (Tr. 361.)  Dr. Flynn noted that Mr. Greer

notes do not contain any observations that Mr. Greer was functionally limited based on his mental impairments. To the contrary, Dr. Carabajal's treatment notes indicated that Mr. Greer's "affect seemed normal, mood seemed normal and no decrease in concentrating ability." (Tr. 925.) On July 20, 2015, January 16, 2016, and March 2, 2016, Dr. Carabajal noted that Mr. Greer was alert and oriented to person, place, time, date and situation. (Tr. 938, 944, 952-53.) On July 20, 2015, she indicated that Mr. Greer's depression and anxiety were stable. (Tr. 930.) Thus, the ALJ's explanation that Dr. Carabajal's opinions lacked a basis in objective evidence and diagnostic testing is reasonable and supported by substantial evidence.

### 2.  Other Medical Source Evidence

### a.  Matthew Fitch, PA-C

PA-C Fitch saw Mr. Greer twenty times from June 11, 2014, through April 1, 2015. (Tr. 505-75, 590-94, 885-910.) PA-C Fitch assessed anxiety and depression in eight treatment notes. (Tr. 505, 511, 533, 571, 885, 890, 896, 901.) On June 11, 2014, PA-Fitch planned to consider an antidepressant pending Mr. Greer's blood work. (Tr. 505.) On June 16, 2014, PA-Fitch prescribed Trazodone. (Tr. 511.) On July 30, 2014, PA-Fitch discontinued Trazodone and prescribed Clonazepam. (Tr. 533.) On January 12, 2015, PA-Fitch noted that Mr. Greer had good control over his overall anxiety and depression symptoms with Clonazepam. (Tr. 572.) On February 11, 2015, PA-C Fitch discontinued Clonazepam and started Citalopram. (Tr. 885-86.) On

---

scored 30 out of a possible 30 points. He was oriented to date, time and place. He did the serial sevens quickly and accurately in his head. He could recall all three words which indicated his recent memory is intact. He printed with his left hand. He was able to copy the geometric figure accurately. Mr. Greer gave a standard answer in the normal range to the question on judgment. The question about smoke in a theater prompted him to say he would run out which suggests he has some problem with impulse control. His insight seemed intact. His level of reasoning is at the abstract level. He has a good fund of general knowledge.

(*Id.*)

February 27, 2015, PA-Fitch discontinued Citalopram and restarted Clonazepam. (Tr. 896-97.) On March 6, 2015, PA-Fitch prescribed Buspirone. (Tr. 901.) None of PA-C Fitch's treatment notes contain evidence of psychological exams or mental status exams, and the only observation noted that related to Mr. Greer's mental impairments was that Mr. Greer had good control over his symptoms with Clonazepam. (Tr. 572.)

On December 19, 2016, PA-C Fitch completed a *Medical Assessment of Ability To Do Work-Related Activities (Mental)* on Mr. Greer's behalf. (Doc. 1043-44.) He assessed that Mr. Greer had *slight limitations* in his ability to (1) remember very short and simple instructions; (2) carry out very short and simple instructions; (3) sustain an ordinary routine without special supervision; and (4) ask simple questions or request assistance. (*Id*.) He assessed that Mr. Greer had *moderate limitations* in his ability to (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods (*i.e.,* 2- hour segment); (5) sustain an ordinary routine without special supervision; (6) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (7) work in coordination with/or proximity to others without being distracted by them; (8) make simple work-related decisions; (9) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (10) interact appropriately with the general public; (11) accept instructions and respond appropriately to criticism from supervisors; (12) get along with coworkers or peers without distracting them or exhibiting behavioral severes; (13) respond appropriately to changes in the work place; (14) be aware of normal hazards and take adequate precautions; (15) travel to unfamiliar places or using public transportation; and (16) set realistic goals or make plans

independently of others. (*Id.*) PA-C Fitch explained that he based his assessed limitations on Mr. Greer's "report." (*Id.*)

The ALJ accorded PA-C Fitch's opinion little weight. The ALJ explained that the opinion itself indicates that the assessed limitations contained therein are based on the claimant's subjective reports and not upon any objective findings. (Tr. 28.) The ALJ further explained that Mr. Greer underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. (*Id.*) The ALJ also discussed that PA-C Fitch was not an acceptable medical provider and could not establish the existence of a medically determinable impairment. (*Id.*)

### b.      Cheryl Brubaker, CNP

CNP Brubaker saw Mr. Greer twice. On March 14, 2016, Mr. Greer presented with cough, congestion and drainage for two weeks. (Tr. 954-59.) CNP Brubaker assessed acute bacterial sinusitis and cough. (*Id.*) On April 22, 2016, Mr. Greer presented for follow up on his cough. (Tr. 960-64.) CNP Brubaker assessed pharyngitis, acute, and allergic rhinitis. (Tr. 960.)

On December 7, 2016, CNP Brubaker prepared a *Medical Source Statement of Ability To Do Work-Related Activities (Mental)* on Mr. Greer's behalf. (Tr. 876-77.) She assessed that Mr. Greer had *no limitations* in understanding and memory. (*Id.*) She assessed Mr. Greer had *slight limitations* in his ability to (1) carry out very short and simple instructions; (2) make simple work-related decisions; (3) ask simple questions or request assistance; and (4) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*) She assessed that Mr. Greer had *moderate limitations* in his ability to (1) carry out detailed instructions; (2) sustain an ordinary routine without special supervision; (3) interact appropriately with the

general public; and (4) get along with coworkers or peers without distracting them or exhibiting behavioral severes; (5) respond appropriately to changes in the work place; (6) be aware of normal hazards and take adequate precautions; and (7) set realistic goals or make plans independently of others. (*Id.*) She assessed that Mr. Greer had *marked limitations* in his ability to (1) maintain attention and concentration for extended periods (*i.e.,* 2- hour segment); (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (3) work in coordination with/or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) travel to unfamiliar places or use public transportation. (*Id.*) CNP Brubaker explained the bases of her assessed limitations as "[l]imitations of concentration and ability to sustain focus and concentration" and "frequent irritability and anxiety impacting interactions and job performance." (*Id.*)

CNP Brubaker also assessed that Mr. Greer met the criteria for Listings 12.04 *Affective Disorders* and 12.06 *Anxiety-Related Disorders*. (Tr. 878-79.)

The ALJ similarly accorded CNP Brubaker's opinion little weight. (Tr. 28.) The ALJ explained that the opinion contained no treatment records, relationship history, or objective findings to support the opinions contained therein. (*Id.*) The ALJ further explained that CNP Brubaker's opinion conflicted with the claimant's repeated normal mental status examinations. (*Id.*)

Mr. Greer argues that the reasons the ALJ provided for according little weight to the two other medical source opinions are inadequate. As for PA-C Fitch's opinion, Mr. Greer relies on

*Robinson* for the proposition that PA-C Fitch could rely on Mr. Greer's subjective complaints to form his opinion regarding Mr. Greer's mental impairments. (Doc. 19 at 17-20.) He further asserts that it was improper for the ALJ to rely on the context in which the assessment was obtained as a basis to discount it. (*Id.*) As for CNP Brubaker's opinion, Mr. Greer argues that the ALJ failed to consider treatment notes from other ABQ Health Partners providers that indicated Mr. Greer's history of and treatment for anxiety and depression. (*Id.*) The Commissioner contends that the ALJ properly relied on the lack of support and explanation for their opinions, as well as their inconsistency with other record evidence. (Doc. 21 at 12-13.)

The regulations contemplate the use of information from "other sources," both medical[22] and non-medical,[23] "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 416.902); *see* SSR 06-03p, 2006 WL 2329939, at *2.[24] "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source'[25] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2.[26] An ALJ is required to explain the weight given to opinions from other medical

---

[22] For claims filed before March 27, 2017, other medical sources are defined as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298.

[23] For claims filed before March 27, 2017, non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298.

[24] SSR 06-3p is rescinded for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298, at *1. For claims filed after March 27, 2017, all medical sources can make evidence that are categorized and considered as medical opinions. *Id.* at *2.

[25] For claimed filed before March 27, 2017, "acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298.

[26] *See* fn. 24, *supra.*

sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5.[27]

Although the ALJ's speculation that Mr. Greer sought and paid for PA-C Fitch's assessment solely to obtain evidence in the current appeal is not a proper basis for discounting a medical source opinion, the ALJ provided appropriate explanations that are supported by substantial evidence for the weight he accorded both PA-C Fitch's and CNP Brubaker's opinions. Here, the ALJ explained that PA-C Fitch explicitly indicated that his assessed limitations were based on Mr. Greer's subjective reports. (Tr. 28.) The record supports this finding. (Tr. 1043-44.) Further, having found Mr. Greer's statements concerning the intensity, persistence and limiting effects of his alleged symptoms were not entirely consistent with the medical evidence and other evidence in the record (Tr. 24), a finding Mr. Greer has not disputed, the ALJ could

---

[27] *Id.*

properly discount findings to the extent they relied on subjective complaints he found to be inconsistent with the record evidence. *See Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2016) (unpublished) (an ALJ can discount findings to the extent they relied on subjective complaints found to be incredible, but must give reasons for rejecting objective assessment); *see generally Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (finding the ALJ was free to reject a treating psychologist's opinion where it appeared to be based on subjective complaints and isolated instances "rather than objective findings"). Additionally, PA-C Fitch did not perform any psychological tests, and PA-C Fitch's treatment notes did not contain any observations that Mr. Greer was functionally limited based on his mental impairments. As such, Mr. Greer's reliance on *Robinson* is misplaced given the lack of psychological testing and/or observed signs and symptoms about Mr. Greer's mental limitations in PA-C Fitch's treatment notes, or in the medical record evidence as a whole. *See* Section III.A.1, *supra.*

The Court also finds that the ALJ's reasons for according little weight to CNP Brubaker's medical source statement are supported by substantial evidence. Here, CNP Brubaker's treatment history with Mr. Greer was limited to seeing him twice for acute *physical* symptoms; *i.e.,* sinusitis and rhinitis. Her treatment notes made no reference to any complaints about or treatment for Mr. Greer's mental impairments, nor did she indicate any observed signs or symptoms related to Mr. Greer's mental limitations. Her medical source opinion is, therefore, not supported by her own treatment notes. Moreover, her opinion is not supported by treatment notes from other ABQ Health Partners providers or by the medical record evidence as a whole. *See* Section III.A.1, *supra.*

For all of the foregoing reasons, the Court finds the ALJ applied the proper regulatory standards in weighing the medical source evidence and provided appropriate explanations

supported by substantial evidence for the weight he accorded the medical and other medical source opinions. As such, there is no reversible error as to this issue.

**B.**     <u>**The ALJ Failed To Resolve the Conflict Between the VE's Testimony and the DOT Regarding the Reasoning Level Requirements of the Jobs Identified**</u>

At step five, the ALJ determined that based on Mr. Greer's age, education, work experience, RFC, and the testimony of the VE, there were jobs that existed in significant numbers in the national economy that Mr. Greer could perform. (Tr. 29-30.) Mr. Greer argues, however, that the ALJ failed to resolve a conflict between the DOT and the VE testimony regarding the reasoning level requirements of the jobs identified, and that after eliminating the two jobs that conflict with the RFC, the resulting number of jobs is so low that it requires a *Trimiar*[28] analysis. (Doc. 19 at 20-25.) Mr. Greer explains that the jobs of inspector/hand packager and small products assembler require a reasoning level of two, and that those jobs are incompatible with the ALJ's mental RFC that limits him to applying "common sense understanding to remember and carry out very short and simple written or oral instructions." (*Id.*) The Commissioner argues there was no apparent conflict to resolve and that the Tenth Circuit, in *Hackett v. Barnhart*,[29] has held that reasoning level two jobs are consistent with a limitation to simple work. (Doc. 21 at 17-21.) The Commissioner also argues that a claimant's General Educational Development ("GED"), which includes a claimant's ability to reason, does not describe the mental or skill requirements of a job, but rather the general educational knowledge or background needed for satisfactory performance. (*Id.*) As such, the Commissioner contends that Mr. Greer's high school education qualifies him for greater than unskilled work. (*Id.*) In the alternative, the Commissioner contends that even if

---

[28] *Trimiar v. Sullivan*, 966 F.2d 1326 (10th Cir. 1992).

[29] 395 F.3d 1168 (10th Cir. 2005).

the Court were to find an unresolved conflict thereby eliminating two of the jobs the VE identified, that the reasoning level one job that remains constitutes enough jobs to be considered significant. (Doc. 21 at 17-21.)

The Tenth Circuit has held that "an ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert testimony as substantial evidence to support a determination of nondisability." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). After the Tenth Circuit's holding in *Haddock*, the Social Security Administration promulgated Social Security Ruling 00-4p and further clarified the ALJ's affirmative responsibility to ask about conflicts. SSR 00-4p instructs that

> [w]hen vocational evidence provided by a VE or VS is not consistent with information in the DOT, the [ALJ] must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The [ALJ] will explain in the determination or decision how he or she resolved the conflict. The [ALJ] must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4.

The ALJ failed to resolve the apparent conflict between the VE's testimony and the DOT regarding the reasoning levels of two for the inspector/hand packager, DOT 559.687-074 and small products assembler, DOT 706.684-022 that the VE identified. This is error. In this case, the ALJ's mental RFC specifically limited Mr. Greer to, *inter alia,* applying common sense understanding to remember and carry out *very short and simple written or oral instructions*. (Tr. 23.) Pursuant to the Dictionary of Occupational Titles, this limitation restricts Mr. Greer to reasoning level one jobs. *See Appendix C – Components of the Definition Trailer*, 1991 WL 688702 (explaining that Reasoning Level I requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions"; Reasoning Level II requires the ability to "[a]pply commonsense

understanding to carry out detailed but uninvolved written or oral instructions. . . ."). Further, although the Tenth Circuit in *Hackett* found that a limitation to "simple routine work tasks" is more consistent with jobs requiring level two reasoning, 395 F.3d at 1176, that is not the case here because the ALJ did not limit Mr. Greer to simple routine work tasks, but to "very short and simple written or oral instructions." (Tr. 23.) As such, *Hackett* does not apply.

Finally, while acknowledging that the GED ratings generally correspond to a person's level of formal and informal education that makes him suitable for a job, *Anderson v. Colvin*, 514 F. App'x 756, 764 (10th Cir. 2013) (unpublished), a claimant's education is one vocational factor that bears on the ALJ's ultimate determination of whether a claimant can adjust to other work at step five. 20 C.F.R. § 416.960(c)(1) (Commissioner considers RFC and vocational factors of age, education, and work experience to decide whether claimant can adjust to work). Moreover, the Court is not persuaded that merely identifying jobs that are unskilled neutralizes or supplants the reasoning level conflict as the Commissioner argues. *See McHerrin v. Astrue*, 2010 WL 3516433, at *6, 156 Soc. Sec. Rep. Serv. 598 (E.D. Pa., Aug. 31, 2010) (explaining that a number of courts have found the DOT's reasoning levels are much more indicative of whether a claimant is capable of performing more than simple, repetitive tasks) (internal citations omitted)); *see also Chapo v. Astrue*, 682 F.3d 1285, 1290, at n. 3 (10th Cir. 2012) ("[w]hile the jobs cited by the VE happen to be unskilled, that just accounted for issues of skill transfer, not impairment of mental functions – which 'are not skills, but, rather, general prerequisites for most work at any skill level'" (quoting *Wayland v. Chater*, 76 F.3d 394 (10th Cir. 1996) (unpublished))); *see also Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (holding that a limitation to unskilled work did not account for several effects of mental impairment; *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (explaining that many unskilled jobs require more than the mental capacity to follow simple instructions); *Cooper*

*v. Barnhart*, 2004 WL 2381515, *4 (N.D. Ola. Oct. 15, 2004) (finding that a limitation to simple tasks appears more squarely addressed by a job's reasoning level, than to its SVP level, which focuses on vocational preparedness necessary to perform the job); SSR 85-15, 1985 WL 56867, at *6 ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job."). For these reasons, the Court declines to adopt the Commissioner's position that the GED reasoning levels can be disregarded when addressing the mental demands of jobs listed in the DOT and that identifying unskilled jobs eliminates any conflicts and accommodates a claimant's limitation to do simple work. Particularly where, as here, the ALJ's RFC did not limit Mr. Greer to "simple" work, but specifically limited his ability to do work-related mental activities in the area of understanding, remembering and carrying out instructions to "very short and simple written or oral instructions." (Tr. 23.)

### C. The ALJ's Step Five Error Is Not Harmless

Where two of the three jobs the VE identified exceeded the ALJ's RFC and the ALJ failed to resolve the apparent conflict between the VE's testimony and the DOT, the question remains whether the one remaining job of conveyor line bakery worker exists in significant numbers such that the ALJ's error is harmless. For the reasons discussed below, the Court cannot conclude that the ALJ's error is harmless.

The Tenth Circuit has emphasized that "the issue of numerical significance entails many fact-specific considerations requiring individualized evaluation" and, as such, "the evaluation 'should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation.'" *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir.

2004) (quoting *Trimiar*, 966 F.2d at 1330).  In *Trimiar v. Sullivan*, 966 F.2d 1326 (10th Cir. 1992),

the issue was whether 650 to 900 jobs existing in the region constituted a significant number.  966

F.2d at 1329-32.  The court stated that "[t]his Circuit has never drawn a bright line establishing

the number of jobs necessary to constitute a "significant number," and noted several factors courts

may consider in evaluating the "significant number" issue, including:  (1) the level of claimant's

disability; (2) the reliability of the vocational expert's testimony; (3) the distance claimant is

capable of traveling to engage in the assigned work; (4) the isolated nature of the jobs; and, (5) the

types and availability of such work.  *Id.* at 1330 (quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087

(8th Cir. 1988)).  The Tenth Circuit ultimately determined that the ALJ had considered those

factors, and that substantial evidence supported his decision.  *Id.* at 1332.

A number of subsequent Tenth Circuit cases have addressed the application of *Trimiar* and

the issue of what constitutes a significant number of jobs.  In *Allen*, the Tenth Circuit remanded

when it determined that the ALJ had erroneously relied on two jobs that were in direct conflict

with his RFC findings to find that significant jobs existed, and concluded that the ALJ "never had

occasion to decide if the one hundred [statewide] surveillance jobs alone constituted a significant

number under the statute."  357 F.3d at 1144.  The *Allen* court rejected the Commissioner's

harmless error argument and held that it would be an improper exercise in judicial factfinding to

excuse the ALJ's failure to assess the numerical significance of the surveillance jobs in connection

with the *Trimiar* factors given the low number of jobs at issue.  *Id.* at 1145. In *Rhodes v. Barnhart*,

117 F. App'x 622 (10th Cir. 2004), the Tenth Circuit remanded where the ALJ had stated on the

record at the administrative hearing that 150 statewide supervisor jobs was not a significant

number of jobs, but subsequently concluded in his decision, without any analysis or discussion of

the *Trimiar* factors, that 150 jobs in the State of Oklahoma and 14,000 jobs nationally were a

significant number of jobs. *Id.* at 632. The court explained that because the ALJ failed to evaluate the *Trimiar* factors and make specific factual findings regarding the numerical significance requirement, it could not properly review the issue. *Id.* In *Chavez v. Barnhart*, 126 F. App'x 434 (10th Cir. 2005), the Tenth Circuit remanded because two of the jobs the VE described conflicted with the Dictionary of Occupational Titles, and the ALJ did "not give explicit consideration to the [*Trimiar*] factors this court has recognized should guide the ALJ's commonsense judgment," and did not have an opportunity to evaluate whether the 199 parking lot attendant jobs in the region, standing alone, existed in significant numbers. *Id.* at 436. In *Norris v. Barnhart*, 197 F. App'x 771 (10th Cir. 2006), the Tenth Circuit remanded on other grounds, but noted that the ALJ's consideration of the *Trimiar* factors on remand could be particularly important given the fairly small number of jobs identified,[30] and in view of the claimant's inability to sit for more than 45 minutes which could preclude her from driving long distances to work. *Id.* at 777.

In contrast, in *Stokes v. Astrue*, 274 F. App'x 675 (10th Cir. 2008), the Tenth Circuit applied harmless error where two of the four jobs the ALJ relied on were determined to be inconsistent with the ALJ's RFC because no reasonable factfinder could determine that suitable jobs did not exist in significant numbers where there were still 11,000 regionally available jobs and 152,000 nationally available jobs from the two remaining jobs. *Id.* at 684. In *Rogers v. Astrue*, 312 F. App'x 138 (10th Cir. 2009), the Tenth Circuit implied that 11,000 nationally available jobs was a significant number.[31] *Id.* at 142. In *Raymond v. Astrue*, 356 F. App'x 173 (10th Cir. 2009), the

---

[30] The VE identified surveillance system monitor (700 to 1000 jobs regionally and 65,000 to 85,000 nationally) and food and beverage order taker (600 jobs regionally and 125,000 nationally). *Norris v. Barnhart*, 197 F. App'x 771, 777 (10th Cir. 2006).

[31] The question before the Court was whether the ALJ failed to resolve a conflict between the VE's testimony and the DOT regarding the exertional requirement for the job of hand packager. *Rogers v. Astrue*, 312 F. App'x 138, 141-42 (10th Cir. 2009). The hand packager job required medium exertional capacity; however, the ALJ's RFC assessment had limited claimant to lifting no more than 10 pounds at a time or lifting and/or carrying more than 3-5 pounds more than occasionally. *Id.* at 141. The Court held that because the VE testified, on the basis of his professional experience,

only question before the court was whether or not the job of rental clerk existed in significant enough numbers. *Id.* at 177. The claimant argued that a significant number of jobs must exist in the *regional* economy before an ALJ can avoid a disability finding and that 385 rental clerk jobs in the region was insufficient. *Id.* at 177. The Tenth Circuit rejected the claimant's argument, holding that the controlling statutes, federal regulations, and case law all indicate that the proper focus is generally on jobs in the national, not regional, economy.[32] *Id.* The court also distinguished the facts in *Trimiar* and noted that *Trimiar* does *not* hold that only regional jobs are relevant, or that a court must engage in a factorial analysis when the number of jobs available is much larger as it was here (1.34 million national jobs). *Id.* at 178, n. 2. Finally, in *Botello v. Astrue*, 376 F. App'x 847 (10th Cir. 2010), the claimant argued that the ALJ had failed to consider his traveling distance pursuant to *Trimiar* as directed by the court on remand. *Id.* at 849-51. The *Botello* court held that even though the ALJ failed to make any findings in his remand decision regarding the distances that claimant would have to travel pursuant to *Trimiar* as ordered, that the court could uphold the ALJ's significant numbers ruling based solely on the number of jobs that the VE identified as being available in the national economy; *i.e.,* 67,250. *Id.* at 851. The court, relying

---

that 11,000 *sedentary* hand packager jobs existed in the national economy, the apparent conflict between the DOT and the VE's testimony regarding the job's exertional requirements was reasonably explained, and the ALJ could rely on the testimony as substantial evidence to support her determination of nondisability. *Id.* at 142.

[32] The Court stated that in 42 U.S.C. § 423(d)(2)(A), for example, Congress prescribed that "[a]n individual shall be determined to be under a disability only if . . . [he cannot] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area . . . '[w]ork which exists in the national economy' means work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country." *Raymond*, 356 F. App'x at 177 (emphasis added); *see also* 20 C.F.R. § 416.966(c) ("We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy."); *Jensen v. Barnhart*, 436 F.3d 1163, 1168 (10th Cir. 2005) ("The Commissioner met her five-step burden of proving that there are sufficient jobs in the national economy for a hypothetical person with Jensen's impairments."); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (noting that the claimant must show his impairments prevent him from performing his past work, and then the burden shifts to the Commissioner to show that the claimant can perform work in the national economy)); *Hamlin v. Barnhart*, 365 F.3d 1208, 1224 (10th Cir. 2004) (noting that jobs need only exist within "the regional *or* national economy") (emphasis added)).

on its unpublished order and judgment in *Raymond*, reiterated that *Trimiar* did not require ALJs to engage in a multi-factorial analysis to assess whether there are significant jobs in the regional economy when the number of national available jobs is significant and unchallenged. *Id.*

The Court is not persuaded that the conveyor line bakery worker job exists in significant numbers in the national economy. Here, the ALJ did not explicitly evaluate or engage in a fact-specific consideration of the numerical significance of 12,000 conveyor line bakery worker jobs in the national economy, *with only 50 statewide jobs*. (Tr. 71.) Nor did the ALJ engage in "individualized evaluation" of the issue of numerical significance. Thus, although the Court may "in the right exceptional circumstance" "supply a missing dispositive finding under the rubric of harmless error," here, there is insufficient information from which the Court "could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Allen*, 357 F.3d at 1144-45. Indeed, while the number of national jobs slightly exceeds the 11,000 nationally available jobs the Tenth Circuit has previously implied constitutes a significant number, *Rogers,* 312 F. App'x at 142, the number of statewide jobs available is far below the number of jobs found in cases in which the Tenth Circuit has remanded for additional evaluation. *See Allen*, 357 F.3d at 1145 (the ALJ never had occasion to decide if 100 statewide surveillance jobs standing alone constituted a significant number); *Rhodes*, 117 F. App'x at 632 (the ALJ failed to evaluate the *Trimiar* factors and make specific findings regarding the numerical significance of 150 statewide and 14,000 national supervisor jobs); and *Chavez*, 126 F. App'x at 436 (the ALJ did not have the opportunity to evaluate whether 199 parking lot attendant jobs in the region, standing alone, existed in significant numbers).

In short, in the absence of both evaluation by the ALJ of numerical significance in the first instance and of "exceptional circumstances," the Court declines to supply a dispositive finding and

is unable to conclude under the circumstances here there are a "significant number" of jobs available to Mr. Greer in the national economy that would support a finding of harmless error. The Court also finds that it would be an improper exercise in judicial factfinding to excuse the ALJ's failure to assess the numerical significance of the conveyor line bakery worker job in connection with all of the *Trimiar* factors given the low number of jobs in New Mexico. *Allen*, 357 F. 3d at 1145; *Raymond*, 356 F. App'x at 178, n.2; *Botello*, 376 F. App'x at 851. The ALJ improperly relied on the VE's testimony to determine that significant jobs existed in the national economy that Mr. Greer could perform and his step five findings are not supported by substantial evidence. *Thompson,* 987 F.2d at 1487. Remand is necessary.

### IV. <u>Conclusion</u>

For the reasons stated above, Mr. Greer has presented some meritorious arguments and his Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 19) is **GRANTED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**